UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIAM ARMSTRONG, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 4:98CV2086 JCH |
| ) | |
| MIKE KEMNA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on remand from the Eighth Circuit Court of Appeals.

## BACKGROUND AND PROCEDURAL HISTORY

In August, 1996, Petitioner William Armstrong was tried for murder in the first degree, for the murder of Carlos McGee, two counts of assault in the first degree, for the wounding of Yolanda Childress and Devonne Davis, and three counts of armed criminal action. A state public defender represented Petitioner. At trial several witnesses, related to the McGee family, testified that Petitioner was the sole shooter. Petitioner testified that someone else did the shooting, but did not identify the shooter. The only witness testifying on Petitioner's behalf, Tanya Williamson, was not present at the scene of the shooting. Petitioner's companions on the night in question, including his brother, Solomon Armstrong ("Solomon"), his foster brother Antwon Hamilton ("Hamilton"), and his friend Charles Brown ("Brown"), had returned to their homes in Milwaukee, Wisconsin, and did not travel to Missouri to testify at Petitioner's trial.

Petitioner was convicted on all counts. On direct appeal, Petitioner raised two issues: (1) that the prosecutor's closing argument deprived Petitioner of due process and a fair trial; and (2) that the trial court abused its discretion in denying the motion for a continuance to secure the attendance of

Solomon and Hamilton. Petitioner did not contest the sufficiency of the evidence against him. The Missouri Court of Appeals held the trial court (1) did not err in allowing the closing argument, and (2) did not abuse its discretion in denying the motion for a continuance. In deciding the continuance issue, the Missouri Court of Appeals stated Petitioner's argument did not yield "a clue about what these witnesses would have testified to or how their testimony would have aided the defense." The Missouri Court of Appeals further concluded the trial record revealed Petitioner could not have secured the presence of his witnesses, "any time in the reasonably foreseeable future." Thus, the Missouri Court of Appeals affirmed the judgment against Petitioner. Petitioner then sought post-conviction relief, but neither the state trial court nor the Missouri Court of Appeals considered the merits of the claims, because Petitioner filed the post-conviction relief motion out-of-time.

Petitioner filed his application for a writ of habeas corpus under 28 U.S.C. § 2254 in this Court on December 17, 1998, raising numerous grounds for relief. In his habeas application, Petitioner swore his "witnesses would have testified that I did not have a weapon, nor was I arguing with anybody, and that someone else from the McGee family were [sic] shooting at us. Someone who they were arguing with in the club. My witnesses' names are Antwon Hamilton, Solomon Armstrong, and Charles Brown." This Court held an evidentiary hearing on February 14, 2002. After excusing Petitioner's procedural default in state court, this Court denied Petitioner's habeas application in its entirety.

On appeal of this Court's Order, Petitioner argued two points. First, he contended the state court denied Petitioner a fair trial, by denying a continuance to secure the attendance of Petitioner's out-of-state witnesses to testify at trial. Second, he contended trial counsel was ineffective, for failing to secure the attendance of Petitioner's out-of-state witnesses at trial. The Eighth Circuit found Petitioner's overriding complaint to be that, "his out-of-state witnesses did not testify at his trial, but

should have." Armstrong v. Kemna, 365 F.3d 622, 627 (8th Cir. 2004). The Eighth Circuit then remanded the matter to this Court, to review Petitioner's ineffective assistance of counsel claim in light of Missouri and Wisconsin's adoption of the Uniform Act to Secure the Attendance of Witnesses From Without the State in Criminal Proceedings (Uniform Act). Id. at 628.

In an Order entered December 15, 2005, this Court again denied Petitioner's petition for writ of habeas corpus. (Doc. No. 94). The Court first held that although Petitioner's counsel could have secured the attendance of his out-of-state witnesses through Wisconsin's participation in the Uniform Act, her failure to do so did not constitute ineffective assistance of counsel. (Id., PP. 9-15). Specifically, the Court found the steps Petitioner's trial counsel took in attempting to secure their attendance, as detailed in the Order, fell within the wide range of professionally competent assistance sanctioned by Strickland, and thus did not constitute deficient performance. (Id.). With respect to Strickland's second prong, the Court held that, "while the prejudice to Petitioner may be assumed in this case, the Court finds it would gut the requirements of Strickland to grant relief on an ineffective assistance of counsel claim without first finding counsel's performance was constitutionally deficient." (Id., P. 15 n. 8). Finally, the Court held Petitioner failed to demonstrate the requisite prejudice with respect to his claim of ineffective assistance of counsel in failing to secure a continuance. (Id., PP. 15-17).

Petitioner again appealed, arguing that in light of Wisconsin's participation in the Uniform Act, his trial counsel's failure to secure the attendance of the out-of-state witnesses constituted ineffective assistance of counsel. The Eighth Circuit first held Petitioner satisfied the first prong of the Strickland test, as his trial counsel did not exercise reasonable diligence in attempting to secure the witnesses' appearance. Armstrong v. Kemna, 534 F.3d 857, 863-866 (8th Cir. 2008). With respect to prejudice, the Eighth Circuit held as follows:

Having concluded Armstrong has satisfied the first prong of Strickland, we now consider whether trial counsel's deficient performance prejudiced Armstrong's defense. To demonstrate Strickland prejudice, Armstrong "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052. To conduct this analysis, we are required to add the expected testimony of the three out-of-state witnesses to the totality of evidence that was actually presented at trial. See McCauley-Bey v. Delo, 97 F.3d 1104, 1105-06 (8th Cir.1996), cert. denied, 520 U.S. 1178, 117 S.Ct. 1453, 137 L.Ed.2d 558 (1997).

In our previous opinion, we remanded to the district court for reconsideration of Armstrong's ineffective assistance of counsel claims. In doing so, we directed the district court to "address *both prongs* of the Strickland analysis, providing the court's findings of fact and conclusions of law." Armstrong I, 365 F.3d at 628 (emphasis added). Despite our clear instruction, the district court concluded Armstrong's trial counsel was not ineffective under the first prong of Strickland and failed to address the Strickland prejudice prong. The district court cursorily concluded Armstrong demonstrated no prejudice on account of his trial counsel's failure to secure a continuance, but the court engaged in no analysis of whether there is a reasonable probability the result of Armstrong's trial would have been different had his trial counsel properly secured the testimony of the out-of-state witnesses. Because the district court failed to follow our instruction to address both prongs of the Strickland analysis, we are now faced with addressing the prejudice inquiry for the first time in these proceedings. For the reasons described below, we conclude the existing record is inadequate for this purpose, in part, because Armstrong has not been given an adequate opportunity to present competent evidence of the out-of-state witnesses' expected testimony. We reverse and remand for further development of the record and so that the district court may conduct the Strickland prejudice analysis in the first instance. See, e.g., Briggs v. Pa. R. Co., 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948) (observing that the Supreme Court has "consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court" (citations omitted)); United States v. Montgomery, 462 F.3d 1067, 1072 (9th Cir. 2006) ("Failure to follow this court's instructions on remand is grounds for the case to be re-remanded for compliance with our instructions." (citations omitted)); see also Burns v. Gammon, 173 F.3d 1089, 1094 (8th Cir. 1999) (remanding and declining to address in the first instance whether the § 2254 petitioner demonstrated deficient performance and prejudice under Strickland).

As it stands, the record fails to disclose, with any degree of reliability, just what testimony the absent witnesses would have given at Armstrong's trial, a deficiency that has plagued this case from the start. See Armstrong I,

365 F.3d at 625, 628 n. 3 (noting the state trial court "was not provided the absent witnesses' expected testimony" when it denied Armstrong's midtrial request for a continuance to secure their attendance). Because Armstrong's motion for state postconviction relief was untimely, no motion hearing was held. And none of the absent witnesses testified at the § 2254 hearing.

Instead, the existing record's limited disclosure of the expected content of the three absent witnesses' testimony is derived from two sources: Armstrong's representations in his § 2254 application and his trial counsel's testimony at the district court's habeas hearing held six years after the shooting. As our prior opinion notes, Armstrong alleged the following in his federal habeas application: "[W]itnesses would have testified that I did not have a weapon, nor was I arguing with anybody, and that someone else from the McGee family were [sic] shooting at us. Someone who they were arguing with in the club." Id. at 625. No bases for those allegations (except that they match Armstrong's own trial testimony) are set out in the application.

At the initial federal habeas hearing, Armstrong's trial counsel testified the only witness she was certain she spoke with before the trial was Solomon. She also testified her investigator had talked to all three of the witnesses by telephone on at least one, and maybe two, occasions. According to counsel, Brown told the investigator (1) he observed an argument in the bar between a male and a female, (2) someone from his group interceded, (3) he heard the shots as he exited the club, and (4) he never saw Armstrong with a gun. Counsel also testified that, based on conversations she had with her investigator, she believed Hamilton and Solomon would have given similar testimony, including testimony Armstrong "did not have a gun ... [and] did not shoot [the victims]." Counsel specifically testified she did not know and did not remember whether either witness would have testified to having seen the shooting take place.

Absent from this record is so much as a signed statement, let alone an affidavit or a sworn evidentiary deposition, from any of the three absent witnesses (one of whom is Armstrong's brother) indicating what their actual testimony would have been at the original trial. Instead, we have only raw, untested hearsay, most of which is twice removed (the declarant witnesses told the investigator who told trial counsel who testified at the § 2254 hearing to the content of the secondhand, out-of-court statements). Even though this hearsay testimony drew no objections during the hearing-in fact, the State or the district court elicited the majority of the hearsay testimony-we do not think that fact gives us license to disregard wholly the diminished probative value of this evidence. The Federal Rules of Evidence do apply to § 2254 proceedings. See Fed.R.Evid. 1101(e).

"Ordinarily, a defendant's failure to present some evidence from the uncalled witness regarding that witness's potential testimony ... would be fatal

to an ineffective assistance of counsel claim." Harrison v. Quarterman, 496 F.3d 419, 428 (5th Cir. 2007) (citations omitted). Because of the inherently abstract nature of our Strickland prejudice inquiry in the uncalled-witness context, see Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002) ("[C]omplaints of uncalled witnesses are not favored ... because allegations of what the witness would have testified are largely speculative." (citation omitted)), federal appellate courts generally insist on a more precise and more reliable showing of the uncalled witnesses' expected testimony than the showing made in the existing record. See Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990) ("[I]f potential trial witnesses are not called to testify at a postconviction review hearing, the petitioner ordinarily should explain their absence and demonstrate, with some precision, the content of the testimony they would have given at trial." (citation and internal quotation marks omitted)); see also Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006) (observing that, in this context, a showing of Strickland prejudice "must be made based on the potential witness's testimony to the habeas court." (citation omitted)); United States ex rel. Partee v. Lane, 926 F.2d 694, 701 (7th Cir. 1991) ("[A] habeas court cannot even begin to apply Strickland's standards to ... a [missing witness] claim unless and until the petitioner makes a specific, affirmative showing as to what the missing evidence or testimony would have been. Without such a showing, it is ... nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance." (citation and internal quotation marks omitted)).

But we conclude Armstrong should not be required to rest his appeal on the basis of the existing record because Armstrong, who was without counsel at the § 2254 hearing,[1] was not given an adequate opportunity to develop the record with respect to the out-of-state witnesses' expected testimony. At the first evidentiary hearing, the district court focused primarily on the first Strickland prong and dismissed Armstrong's argument that if he had legal counsel he "could have been prepared by having [his] brothers ... personally testif[y] ... before the Court." The district court replied, "the issue here is not having them testify in front of me ... it would not have helped at all to have ... your friends, brother, and your mother here." On remand, the district court declined to hold a second evidentiary hearing and, contrary to our express instructions, again primarily confined its analysis to the first prong of Strickland. Thus, Armstrong had little opportunity to improve the state of the record following our remand. In the proceedings following this second

---

[1] It is unclear to us why Armstrong did not receive counsel for the first evidentiary hearing. "The interests of justice require the court to appoint counsel when the district court conducts an evidentiary hearing on the petition." Hoggard v. Purkett, 29 F.3d 469, 471 (8th Cir. 1994) (citations omitted); see Rule 8(c), Rules Governing Section 2254 Cases in the United States District Courts ("If an evidentiary hearing is warranted, the judge *must* appoint an attorney to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A." (emphasis added)).

> remand, Armstrong should have an adequate opportunity to present further evidence of what the three out-of-state witnesses would have testified to had they been properly secured to testify at Armstrong's trial.
>
> ### III. CONCLUSION
>
> The district court's judgment denying Armstrong's § 2254 application is reversed. The case is once again remanded to the district court to provide Armstrong with a fair opportunity to develop the record concerning the actual content of the absent witnesses' testimony, and for the district court to conduct an analysis of whether Armstrong has demonstrated prejudice under Strickland.

Armstrong v. Kemna, 534 F.3d at 866-868.

On remand, this Court appointed counsel for Petitioner, and held a second evidentiary hearing on January 20, 2009. Witnesses included Solomon Armstrong, Antwon Hamilton, Petitioner, and Erik Thomas, an investigator for the State.

## **EVIDENCE PRESENTED AT SECOND EVIDENTIARY HEARING**

### A. **Solomon Armstrong**

Solomon testified that in January, 1996, he, Petitioner, Hamilton, Hamilton's brother Tyreese Hamilton ("Tyreese"), and Brown traveled to Hayti, Missouri, to visit with Hamilton's relatives. (Evidentiary Hearing Transcript ("Tr."), PP. 8-9). Solomon testified there were never guns in his and Petitioner's home, and during the trip, he did not see anyone with a firearm. (Tr., P. 11).

According to Solomon, when the group arrived in Hayti, they stopped at the home of a relative of Hamilton's, Diane Davis ("Diane"), and later went with Diane to a nightclub called CJ's. (Tr., PP. 11-12, 15). The group eventually was joined by a woman named Tanya, and her sister Terese. (Tr., P. 16). At some point Diane and Tyreese left Petitioner's table and crossed the room, where Diane began whispering in Tyreese's ear. (Tr., PP. 16-17). Another gentleman then approached Diane and Tyreese, grabbed Diane, and slapped her in the face. (Tr., PP. 17-18).

Although Solomon and Hamilton had made their way over to Diane before she was slapped, Solomon testified Petitioner never left the table where he was sitting. (Tr., PP. 18, 19).[2]

Solomon testified the bouncer unsuccessfully tried to de-escalate the situation, and then asked Petitioner, Solomon, Hamilton, Tyreese, Brown, and the two young ladies at their table to leave the club. (Tr., PP. 20-21). Before they could do so, however, Carlos and Terrell McGee tried to pick a fight with Solomon's group. (Tr., PP. 21-22).[3]

Solomon exited the club with Hamilton and Tyreese, while Petitioner remained inside to retrieve his jacket. (Tr., P. 23). Solomon attempted to remove his car from the mud, and tried to get other members of his group to help him do so. (Tr., PP. 23, 24). It was during this time period that he heard gunshots, coming from the area near the entrance to the club where the McGees and certain members of Solomon's family were standing. (Tr., PP. 24, 25).[4]

While Solomon, Petitioner, Hamilton, Tyreese and Brown tried to dislodge Solomon's vehicle from the mud, there were still gunshots being fired at them. (Tr., P. 26).[5] Fearing for their lives, they ran away from the club to one of Hamilton's relative's houses. (Tr. P. 27). Shortly thereafter, shots were fired into that home from the front of the house, and the group ran to take cover. (Tr., PP. 27-28).[6] A police officer arrived at the house to investigate, and wound up being shot by the drive-by

---

[2] Solomon testified he did not see anyone at his table with a firearm, and the only person he ever saw with a firearm was the club's bouncer. (Tr., PP. 19-20).

[3] Solomon testified that before the night in question, he had never met Carlos or Terrell McGee. (Tr., P. 22).

[4] Solomon testified he did not recall Petitioner being in the area near the entrance to the club. (Tr., PP. 25-26).

[5] Solomon did not see who was firing the shots. (Tr., PP. 49-50).

[6] Solomon testified that noone in the home returned fire, because they did not have firearms. (Tr., P. 29).

shooters. (Tr., P. 29). Everyone in the home, with the exception of Brown, was then taken into custody. (Tr., P. 30). After being held in separate jail cells, Solomon, Hamilton and Tyreese were released. (Tr., PP. 32, 33). Petitioner was not released, however, allegedly because an eyewitness said they had seen him with a gun. (Tr., P. 34).[7]

After spending the night in a hotel, Solomon returned to Milwaukee by bus. (Tr., PP. 34, 35). Solomon testified that had he been provided funds, he definitely would have come to testify at Petitioner's trial. (Tr., P. 37).

### B. Antwon Hamilton

Hamilton testified that in January, 1996, he went to Hayti, Missouri, to visit relatives. (Tr., PP. 57-58). Traveling with Hamilton were Petitioner, Solomon, Tyreese, and Brown. (Tr., PP. 58-59). When they arrived in Hayti, they went straight to Hamilton's cousin, Diane Davis's house. (Tr., P. 59). Diane's boyfriend, Terrell McGee, stopped by the home that afternoon. (Tr., P. 60).

Later that evening, Hamilton and his companions left to go to the club. (Tr., P. 61). They sat at a table, had a few drinks, and danced. (Tr., PP. 61-62). At some point, while Hamilton was dancing near the back of the club, he noticed a commotion at the front of the club. (Tr., P. 63). Hamilton approached the front of the club, and saw Terrell McGee. (Tr., P. 63). Although they had been friends in the past, when Hamilton asked Terrell if he was alright, Terrell got defensive. (Tr., PP. 63-64). Hamilton then asked Tyreese what was going on, and Tyreese said Terrell had slapped Diane. (Tr., P. 64). Hamilton then confronted Terrell, and suggested they "take it outside the club." (Tr., PP. 64-65).[8] Hamilton then exited the club, followed by Terrell and several of his family

---

[7] Solomon testified he heard Petitioner being beaten in another cell. (Tr., P. 32).

[8] According to Hamilton, Petitioner neither noticed nor became involved in the fight at the bar. (Tr., P. 88).

members. (Tr., P. 65). Eventually Hamilton's family and friends came out as well. (Tr., P. 66). Solomon, Petitioner, Tyreese and Brown attempted to calm Hamilton, who had become quite aggressive. (Tr., P. 67). Petitioner especially tried to get Hamilton to leave, telling him the other side had guns. (Tr., P. 68).[9] Hamilton was still ready to fight at that point, until he heard gunshots. (Tr., P. 69).

At the sound of the gunshots. Hamilton ran back toward the car they came in, which was stuck in the mud. (Tr., P. 71). Hamilton believes Solomon was in the car with him, and Petitioner, Tyreese and Brown were outside the car. (Tr., P. 72). When they couldn't free the car, they jumped out and ran toward the road. (Tr., P. 72). As they ran, they could hear threats from the other side. (Tr., P. 72).

Hamilton and his group ran to his cousin, Channelle Davis's house. (Tr., PP. 72-73). Once inside, they heard gunshots again, from outside the house. (Tr., P. 74). The police arrived, and one of the officers was shot. (Tr., PP. 74-75). Brown eventually left, and the officers arrested Hamilton, Petitioner, Tyreese and Solomon. (Tr., P. 76). As Hamilton was being escorted past cell doors for interrogation, he saw Petitioner behind a cell door, his face beaten and bloodied. (Tr., P. 78). The Sheriff escorting Hamilton said Petitioner was the suspected shooter. (Tr., P. 78).

Hamilton was released the next day, and never charged with a crime. (Tr., P. 82). He stayed in a hotel for one night, and then returned to Milwaukee by bus with Solomon, Tyreese and Brown. (Tr., P. 85).

Hamilton testified that had Petitioner's attorney made travel and security arrangements, he would have returned to testify on Petitioner's behalf. (Tr., P. 86).

---

[9] Hamilton testified he did not recall seeing anyone with a firearm in the club. (Tr., PP. 66-67). He further testified that noone in his party had a firearm. (Tr., P. 68).

- 10 -

# DISCUSSION[10]

Under federal law, in order to prevail on his ineffective assistance of counsel claim, Petitioner must show that his attorney's performance was "deficient," and that the deficient performance was "prejudicial." Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. To overcome this presumption, Petitioner must prove that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id.

Even if Petitioner satisfies the performance component of the analysis, he is not entitled to relief unless he can prove sufficient prejudice. Id. at 694. To do so, Petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

As stated above, the Eighth Circuit Court of Appeals previously held Petitioner here satisfied the first prong of the Strickland test, as his trial counsel did not exercise reasonable diligence in attempting to secure the witnesses' appearance. Armstrong v. Kemna, 534 F.3d at 863-866. This Court thus considers whether Petitioner successfully has demonstrated prejudice to his defense resulting from the error.

---

[10] In his opening brief, Respondent devotes a portion of his discussion to the issue of the untimeliness of Petitioner's original petition. (Respondent's Post-Hearing Brief, PP. 1-3). Respondent advanced this argument before the Eighth Circuit, which declined to address the issue, holding that the interests of justice were better served by addressing the merits of Petitioner's habeas petition. Armstrong v. Kemna, 534 F.3d at 863 n. 4. Similarly, this Court declines Respondent's invitation to consider the timeliness issue, and will instead address the merits of Petitioner's claim.

The Eighth Circuit set forth the standard for addressing a claim of prejudice based on uncalled witnesses in McCauley-Bey v. Delo, 97 F.3d 1104 (8th Cir. 1996), cert. denied, 520 U.S. 1178 (1997), as follows:

> In this case, we are required to add the proffered testimony of McCauley-Bey's uncalled witnesses to the body of evidence that actually was presented at his trial. Using this hypothetical construct, we must gauge the likely outcome of a trial based on this total body of evidence. Prejudice exists if there is a reasonable probability that the outcome would be different than that at the actual trial. In conducting this analysis, we are mindful of: (1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution.

Id. at 1105-1106.

### A. **Credibility**

With respect to credibility, the Court notes neither Solomon nor Hamilton gave a prior statement in this matter, with which he could have been impeached at trial. Further, it is undisputed that at the time of trial, neither man had a criminal conviction that would have impaired his testimony.[11] After hearing their testimony, the Court concludes the two men could have buttressed Petitioner's own testimony at trial, by providing eyewitness accounts from both inside and outside the club. Finally, while small details may have varied between the accounts the two men gave more than thirteen years after the fact, they were unequivocal in their assertions that Petitioner never possessed a firearm, and thus could not have shot Carlos McGee or the two assault victims. Upon consideration of the foregoing, the Court finds Solomon and Hamilton were credible witnesses, and that their testimony corroborated Petitioner's own on several salient points.

---

[11] Hamilton subsequently was convicted on a controlled substance charge in September, 1999, and now resides at FCI Pekin. (Tr., P. 56). As of August, 1996, however, Hamilton had no criminal convictions. (Tr., PP. 56-57).

### B. Interplay Between Called And Uncalled Witnesses

As noted above, at trial the only defense witnesses presented were Petitioner himself, and Tanya Williamson, who admittedly was not outside the club at the time of the shooting. Solomon and Hamilton's testimony in favor of Petitioner thus could not have been considered cumulative in any manner. Further, the Court notes that while both men had personal relationships with Petitioner, that fact is neutralized by the fact that all the State's witnesses had personal relationships with the victims and/or with each other. The Court thus finds a substantial probability that Solomon and Hamilton would have been just as credible as the witnesses for the State, and could have provided a defense for Petitioner had they been called to testify.

### C. Strength Of Evidence Presented By Prosecution

In considering the strength of the evidence presented by the prosecution at trial, the Court reiterates its finding that there was some confusion regarding both the ballistics reports from the shootings of Carlos McGee and the police officer, and the chains of custody of the bullets from the shootings (not all of which were available for trial). (Doc. No. 59, P. 3). Further, no firearm was introduced at trial. (Id.). Finally, as noted above, all the eyewitnesses presented by the State had personal relationships with the victims and/or with each other. The Court thus finds the evidence presented by the State at trial was not unassailable, and successfully could have been challenged through the testimony of Solomon and Hamilton.

### D. Conclusion

Upon consideration of the foregoing, the Court finds the net effect of Petitioner's attorney's failure to secure the attendance of Solomon and Hamilton as witnesses undermines this Court's confidence in the outcome of Petitioner's trial. Strickland, 466 U.S. at 694. Specifically, the Court finds Solomon and Hamilton were credible witnesses; their testimony corroborated Petitioner's own

on several salient points; and their testimony was significant, as it contradicted the testimony of the witnesses presented by the State at trial. When considered in conjunction with the other deficiencies in the State's case, the Court concludes Petitioner successfully has demonstrated, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. The Court thus will grant Petitioner's petition for habeas relief. The Court further will order Respondent to release Petitioner from all custody, unless the State of Missouri moves to retry him within one hundred twenty (120) days of the date of this Order.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Petition for Habeas Relief (Doc. No. 2) is **GRANTED**.

**IT IS FURTHER ORDERED** that Petitioner shall be released from all custody, unless the State of Missouri moves to retry him within one hundred twenty (120) days of the date of this Order.

Dated this 24th day of April, 2009.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE